# United States Court of Appeals
# for the Federal Circuit

---

**JAMES L. KISOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2016-1929

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 14-2811, Senior Judge Alan G. Lance, Sr.

---

## ON PETITION FOR REHEARING EN BANC

---

PAUL WHITFIELD HUGHES, McDermott, Will & Emery LLP, Washington, DC, filed a petition for rehearing en banc for claimant-appellant. Also represented by KENNETH M. CARPENTER, Law Offices of Carpenter Chartered, Topeka, KS.

IGOR HELMAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, filed a response to the petition for respondent-appellee. Also represented by JEFFREY B. CLARK, MARTIN F. HOCKEY, JR., ROBERT EDWARD KIRSCHMAN, JR.; Y. KEN LEE,

SAMANTHA ANN SYVERSON, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

ROMAN MARTINEZ, Latham & Watkins LLP, for amici curiae American Veterans, National Organization of Veterans' Advocates, Inc., Paralyzed Veterans of America, Veterans of Foreign Wars of the United States, Vietnam Veterans of America.  Also represented by GREGORY B. IN DEN BERKEN.

————————————

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, MOORE, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges*.

PROST, *Chief Judge*, with whom LOURIE, WALLACH, TARANTO, and CHEN, *Circuit Judges*, join, and with whom HUGHES, *Circuit Judge*, joins as to Parts I.B–C and II, concurs in the denial of the petition for rehearing en banc.

HUGHES, *Circuit Judge*, with whom WALLACH, *Circuit Judge*, joins, concurs in the denial of the petition for rehearing en banc.

DYK, *Circuit Judge*, concurs in the denial of the petition for rehearing en banc.

O'MALLEY, *Circuit Judge*, with whom NEWMAN, MOORE, and REYNA, *Circuit Judges*, join, dissents from the denial of the petition for rehearing en banc.

REYNA, *Circuit Judge*, with whom NEWMAN, MOORE, and O'MALLEY, *Circuit Judges*, join, dissents from the denial of the petition for rehearing en banc.

PER CURIAM.

# O R D E R

James L. Kisor filed a petition for rehearing en banc. A response to the petition was invited by the court and filed by the Secretary of Veterans Affairs. American Veterans, National Organization of Veterans' Advocates, Inc., Paralyzed Veterans of America, Veterans of Foreign Wars of the United States, and Vietnam Veterans of America requested leave to file a brief as amici curiae, which the court granted. The petition for rehearing, response, and amicus brief were first referred to the panel that heard the appeal, which granted the petition in part as indicated in the accompanying order. Thereafter, the petition was referred to the circuit judges who are in regular active service. The court conducted a poll on request, and the poll failed.

Upon consideration thereof,

IT IS ORDERED THAT:

The petition for rehearing en banc is denied.


FOR THE COURT

April 30, 2021                    /s/ Peter R. Marksteiner
    Date                          Peter R. Marksteiner
                                  Clerk of Court

# United States Court of Appeals
# for the Federal Circuit

---

**JAMES L. KISOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2016-1929

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 14-2811, Senior Judge Alan G. Lance, Sr.

---

PROST, *Chief Judge*, with whom LOURIE, WALLACH, TARANTO, and CHEN, *Circuit Judges*, join, and with whom HUGHES, *Circuit Judge*, joins as to Parts I.B–C and II, concurring in the denial of the petition for rehearing en banc.

I concur with the court's decision to deny rehearing en banc. I write separately in response to my dissenting colleagues regarding the proper role of the pro-veteran canon, which instructs that "interpretive doubt" is to be resolved in the veteran's favor. *Brown v. Gardner*, 513 U.S. 115, 118 (1994). In what follows, I (I) delineate my view of the proper place for this canon in the order-of-operations of textual interpretation, (II) respond to my dissenting

colleagues' treatment of this canon, and (III) discuss the unresolved tension between this canon and the Supreme Court's *Chevron* and *Auer* doctrines.

## DISCUSSION

### I.   THE PROPER ROLE OF THE PRO-VETERAN CANON

In my view, the Majority is right: "Interpretive doubt" is a precondition for applying the pro-veteran canon, and that precondition "is not satisfied where a sole reasonable meaning is identified through the use of ordinary textual analysis tools." Maj. at 16.[1]  Put another way, courts must first seek the "best reading" of the statute based on "the words themselves," "the context of the whole statute," and "any other applicable semantic canons, which at the end of the day are simply a fancy way of referring to the general rules by which we understand the English language." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2144–45 (2016) (reviewing Robert A. Katzmann, *Judging Statutes* (2014)).  As explained in detail below, in view of (A) the Supreme Court's insistence on the primacy of text, (B) the pro-veteran canon's historical usage and the other canons most like it, and (C) Congress's consistently active role in veterans law, I am persuaded that the pro-veteran canon should play a role only when a sustained textual analysis—including any applicable descriptive canons—yields competing plausible interpretations, none of which is fairly described as the best.

### A.  THE PRIMACY OF TEXT

In order to place the pro-veteran canon in the Supreme Court's interpretive methodology, it is necessary to first set

---

[1]   I refer to the Majority's panel opinion as "Maj."  I refer to Judge Reyna's dissent from the panel's opinion as "Panel Dissent."  I refer to Judge O'Malley's dissent from the denial of rehearing en banc as "O'Malley Dissent."

the stage by outlining the hierarchy of interpretive tools the Court applies.[2] At the top of this hierarchy is the text. In the Court's words, "canons of construction are no more than rules of thumb," and the text is the "one, cardinal canon" a court must turn to "before all others." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992). And "[w]hen the words of a statute are unambiguous, . . . this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)); *accord* Katzmann, *supra*, at 29 ("When statutes are unambiguous, . . . the inquiry for a court generally ends with an examination of the words of the statute."). Of course, this

---

[2]    Although the interpretive method described in this opinion is often set forth with reference to statutes, the same general methodology applies to regulations, as in this case. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (explaining that "a court must exhaust all the 'traditional tools' of construction" and observing that *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984), adopted the "same approach for ambiguous statutes"). That said, if the pro-veteran canon is based on the theory that it is a proxy for congressional intent, one wonders why it should apply to regulations as well as statutes, or at least whether it would apply with equal force. The Supreme Court has not addressed that question. Regardless, because our court did apply the canon to a regulation in *Hudgens v. McDonald*, 823 F.3d 630 (Fed. Cir. 2016), I will assume for purposes of this opinion that it applies to both statutes and regulations. Even on this assumption, it is important when interpreting a regulation to consider the specific statutory provisions reflecting the pertinent congressional policies, which may include important limits on benefits. For example, as relevant here, the statute's finality policies tightly limit retroactive alteration of final agency determinations while making prospective redetermination broadly available.

4                                    KISOR v. MCDONOUGH

text-first rule is not an instruction to "construe the meaning of statutory terms in a vacuum." *Tyler v. Cain*, 533 U.S. 656, 662 (2001).  Rather, our focus on the text requires us to "interpret the words in their context and with a view to their place in the overall statutory scheme." *Id.* (internal quotation marks omitted).

As we analyze text and context, some canons of interpretation enter the analysis.  "Canons are general background principles that courts have developed over time to guide statutory interpretation." *Arangure v. Whitaker*, 911 F.3d 333, 339 (6th Cir. 2018).  They come in several flavors.  Many canons are no more than aids for analyzing the text and context, "guides to solving the puzzle of textual meaning."  Antonin Scalia & Bryan A. Garner, *Reading Law* 59 (2012).  These "descriptive" canons  "simply reflect broader conventions of language use, common in society at large at the time the statute was enacted."  Caleb Nelson, *What Is Textualism?*, 91 Va. L. Rev. 347, 383 (2005).[3]  The series-qualifier canon, for example, "generally reflects the most natural reading of a sentence." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021); *id.* at 1169–73 (identifying best meaning by analyzing text, context, and descriptive canons).    Other familiar examples include *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of others) and *noscitur a sociis* (associated words bear on one another's meaning). *See generally* Scalia & Garner, *supra*, at 107–11, 195–98.  Canons

---

[3]    My focus when discussing descriptive canons is on the "strongest species"—i.e., those that "clearly and exclusively serve descriptive, rather than normative, purposes." *See Arangure*, 911 F.3d at 340.  These canons, which may also be termed "linguistic" canons, may be further categorized under other labels, such as "semantic," "syntactic," or "contextual." *See generally* Scalia & Garner, *supra*, at 69–234.

of this sort "are not 'rules' of interpretation in any strict sense but presumptions about what an intelligently produced text conveys." *Facebook*, 141 S. Ct. at 1174 (Alito, J., concurring) (quoting Scalia & Garner, *supra*, at 51).

Other canons "direct courts to construe any ambiguity in a particular way in order to further some policy objective." Nelson, *supra*, at 418 n.140 (quoting Stephen F. Ross, *Where Have You Gone, Karl Llewellyn? Should Congress Turn Its Lonely Eyes to You?*, 45 Vand. L. Rev. 561, 563 (1992)). Canons of this sort are a type of "normative" canon. *Id.* They enter the calculus when judges "need some way to finish the job and to pick from among the possible meanings that their primary interpretive tools have identified." *Id.* at 394. Accordingly, many normative canons "express a rule of thumb for choosing between equally plausible interpretations of ambiguous text"—i.e., when descriptive tools do not illuminate a best meaning. Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 109 (2010). As explained below, the pro-veteran canon is of this variety—and therefore should be considered only if descriptive tools do not yield a best meaning.

## B. THE HISTORY OF THE PRO-VETERAN CANON

With that backdrop in place, I turn to the pro-veteran canon. The canon's history is relatively short. It appears to have originated with a closing remark in the Supreme Court's World War II–era *Boone v. Lightner* opinion. 319 U.S. 561 (1943).[4] Not citing any authority, the Court concluded by stating that "[t]he Soldiers' and Sailors' Civil Relief Act is always to be liberally construed to protect

---

[4]    The rule of lenity, by comparison, "antedates both state and federal constitutions." Scalia & Garner, *supra*, at 297.

those who have been obliged to drop their own affairs to take up the burdens of the nation." *Id.* at 575.

Since *Boone*, the Court has applied the canon rarely. In some cases, the Court has referenced the canon without expressly applying it in statutory analysis. *Ala. Power Co. v. Davis*, 431 U.S. 581, 584 (1977) (analyzing Military Selective Service Act of 1967); *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196 (1980) (analyzing Vietnam Era Veterans' Readjustment Assistance Act of 1974); *Shinseki v. Sanders*, 556 U.S. 396, 412 (2009) (recognizing Congress's "solicitude for the veterans' cause" but not applying the canon). In others, the Court has not mentioned the canon at all. *See McKinney v. Missouri-Kansas-Texas R.R. Co.*, 357 U.S. 265 (1958) (analyzing Universal Military Training and Service Act); *Accardi v. Penn. R.R. Co.*, 383 U.S. 225 (1966) (analyzing Selective Training and Service Act of 1940); *Foster v. Dravo Corp.*, 420 U.S. 92 (1975) (analyzing Military Selective Service Act); *Monroe v. Standard Oil Co.*, 452 U.S. 549 (1981) (ignoring the dissent's mention of the canon); *Conroy v. Aniskoff*, 507 U.S. 511 (1993) (ignoring the concurrence's mention of the canon). In still others, the Court has invoked the canon only to further confirm an interpretation that it reached by analyzing text and context. *E.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991); *Brown*, 513 U.S. at 118; *see also Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428 (2011) (also analyzing structure of the statutory scheme). Importantly, as the Court explained in *Brown*, the canon applies only when there is "interpretive doubt." 513 U.S. at 118.[5]

---

[5]    Accordingly, we have repeatedly emphasized this precondition. *See, e.g.*, *McKnight v. Gober*, 131 F.3d 1483, 1485 (Fed. Cir. 1997); *Jones v. West*, 136 F.3d 1296, 1299 n.2 (Fed. Cir. 1998); *Boyer v. West*, 210 F.3d 1351, 1355 (Fed. Cir. 2000); *Paralyzed Veterans of Am. v. Sec'y of*

The Supreme Court has therefore used two formulations of the pro-veteran canon. The Court's initial formulation provides that provisions are "to be liberally construed" for the benefit of veterans. *Boone*, 319 U.S. at 575. This version resembles the broader notion that remedial statutes should be liberally construed. *See generally* Scalia & Garner, *supra*, at 364–66. The more recent formulation, on the other hand, provides that "interpretive doubt" is to be resolved in the veteran's favor. *Brown*, 513 U.S. at 118. This version closely resembles the rule of lenity, which instructs that ambiguity in a statute defining a crime or imposing a penalty should be resolved in the defendant's favor. *See, e.g.*, *Moskal v. United States*, 498 U.S. 103, 108 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists . . . ."); *see generally* Scalia & Garner, *supra*, at 296–302. As explained below, the result is the same under either formulation: The pro-veteran canon should be considered only after descriptive tools fail to yield a best meaning of the provision.

### 1. THE *BOONE* FORMULATION

The canon's origin as a species of the liberal-construction principle is one reason why the canon should play no role until after a full textual analysis yields no best meaning. As an initial matter, the liberal-construction principle has long been understood to yield to the text (as illuminated by the descriptive canons). As Justice Story once explained, "this liberality of exposition . . . is clearly

---

*Veterans Affairs*, 345 F.3d 1334, 1340 (Fed. Cir. 2003); *Thomas v. Nicholson*, 423 F.3d 1279, 1284 n.5 (Fed. Cir. 2005); *Nielson v. Shinseki*, 607 F.3d 802, 808 (Fed. Cir. 2010); *Frederick v. Shinseki*, 684 F.3d 1263, 1269 (Fed. Cir. 2012); *Spicer v. Shinseki*, 752 F.3d 1367, 1371 (Fed. Cir. 2014); *Parrott v. Shulkin*, 851 F.3d 1242, 1251 (Fed. Cir. 2017).

inadmissible, if it extends beyond the just and ordinary sense of the terms." Scalia & Garner, *supra*, at 364 (quoting 1 Joseph Story, *Commentaries on the Constitution of the United States* § 429, 304 (2d ed. 1858)).[6]

Any broader view of the liberal-construction principle is now heavily disfavored. The Supreme Court has called the principle, when broadly understood to override the fair meaning of the text, the "last redoubt of losing causes." *Dir., Off. of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995). And for good reason. Such a view "is premised on two mistaken ideas: (1) that statutes have a singular purpose and (2) that Congress wants statutes to extend as far as possible in service of that purpose." *Keen v. Helson*, 930 F.3d 799, 805 (6th Cir. 2019). Contrary to those mistaken ideas, the Supreme Court has explained that "[l]egislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known pursues its stated purpose at all costs." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) (cleaned up). Indeed, "[e]very statute proposes, not only to achieve certain ends, but also to achieve them by particular means—and there is often a considerable legislative battle over what those means ought to be." *Newport News*, 514 U.S. at 136. As Justice Sotomayor recently remarked for a unanimous Court:

---

[6] The liberal-construction principle may have begun long ago as an "antidote" to the rule that statutes in derogation of the common law were to be strictly construed—reducing it to "nothing more than rejection of 'strict construction' and insistence on fair meaning." Scalia & Garner, *supra*, at 365–66. Justice Scalia remarked, however, that courts have at times used the liberal-construction principle "to devastating effect." Antonin Scalia, *A Matter of Interpretation* 27–28 (1997).

It is not for us to "take a chainsaw to . . . nuanced problems when Congress meant to use a scalpel." *Facebook*, 141 S. Ct. at 1171; *see also id.* at 1172–73 (rejecting "mere[] gestures at Congress' 'broad privacy-protection goals'" because the Court "must interpret what Congress wrote"). Ultimately "the effort, with respect to *any* statute, should be neither liberally to expand nor strictly to constrict its meaning, but rather to get the meaning precisely right." Antonin Scalia, *Assorted Canards of Contemporary Legal Analysis*, 40 Case W. Res. L. Rev. 581, 582 (1990). At best, to the extent that there are legitimate uses of the liberal-construction principle, it "may be invoked, in case of ambiguity, to find present rather than absent elements that are essential to operation of a legislative scheme; but it does not add features that will achieve the statutory 'purposes' more effectively." *Newport News*, 514 U.S. at 135–36.

Consistent with this critique, the Supreme Court in some cases has rejected the liberal-construction principle's application altogether. In *Norfolk Southern Railway Co. v. Sorrell*, for example, the Court rejected a party's reliance on the "remedial purpose" and "history of liberal construction" of the Federal Employers' Liability Act ("FELA"). 549 U.S. 158, 171 (2007). Although the Court recognized that "FELA was indeed enacted to benefit railroad employees," the Court explained that "[i]t does not follow, however, that this remedial purpose requires us to interpret every uncertainty in the Act in favor of employees." *Id.* (citing *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.")). The Court concluded that "the statute's remedial purpose cannot compensate for the lack of a statutory basis." *Id.*; *see also Cronin v. United States*, 765 F.3d 1331, 1337–38 (Fed. Cir. 2014) (declining to rest on "the need to construe [a statute] liberally for members of the armed services" because doing so does not "give sufficient weight to the

natural meaning" of the provision "given its language and setting" and because "no legislation pursues its purposes at all costs").

Similarly, the Court in *CTS Corp. v. Waldburger* disagreed with the Fourth Circuit's analysis, which relied on "the proposition that remedial statutes should be interpreted in a liberal manner." 573 U.S. 1, 12 (2014). Specifically, the Court explained that the Fourth Circuit "was in error when it treated this as a substitute for a conclusion grounded in the statute's text and structure." *Id.*; *see also Rodriguez*, 480 U.S. at 525 ("[M]ost impermissibly, the Court of Appeals relied on its understanding of the broad purposes of the [statute] . . . ."). After all, the Court emphasized, "no legislation pursues its purposes at all costs." *CTS Corp.*, 573 U.S. at 12. To the contrary, "[c]ongressional intent is discerned primarily from the statutory text." *Id.* After dismissing the liberal-construction principle outright, the Court interpreted the statute by undertaking a sustained textual analysis. *Id.* at 12–18. Only after doing so did the Court consult a normative canon— that "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption"—and only for "additional support." *Id.* at 18–19 (internal quotation marks omitted).

*Christopher v. SmithKline Beecham Corp.*, on which Judge O'Malley relies, further proves the point. *See* O'Malley Dissent at 20–21 (discussing 567 U.S. 142 (2012)). After deciding that it would be improper to defer under *Auer v. Robbins*, 519 U.S. 452 (1997), the Court in *Christopher* proceeded to "employ traditional tools of interpretation." 567 U.S. at 161.[7] The Court followed the usual hierarchy.

---

[7]    Deferring under *Auer* there would have produced "unfair surprise" and deprived the employer of "fair warning" under the Court's cases. *Christopher*, 567 U.S. at 156.

It started with the text. *Id.* Then it analyzed the context. *Id.* at 162 (explaining that "any" can mean "different things depending upon the setting"). Next, it consulted a descriptive canon: "the rule of *ejusdem generis* should guide our interpretation of the catchall phrase, since it follows a list of specific items." *Id.* at 163. Only after that descriptive analysis did the Court turn to a normative canon—mentioning in a footnote a statement in an earlier case that exemptions for employers in the FLSA must be "narrowly construed against the employers." *Id.* at 164 n.21 (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

But the Court in *Christopher* did not even apply that canon, noting instead that it was "inapposite" because the Court was "interpreting a general definition that applies throughout the FLSA." *Id.* Although Judge O'Malley argues that *Christopher* "did not relegate the remedial purpose of the [FLSA] scheme to an afterthought," O'Malley Dissent at 21, in fact *Christopher* declared the canon inapplicable to the case before it. And when the Court, near the end of its opinion, stated that its interpretation "comports with the apparent purpose" of the particular FLSA provision at issue, *Christopher*, 567 U.S. at 166, it was not applying a liberal-interpretation canon for remedial laws, but completing its textualist determination of the "fair reading" of the statute—a determination that "requires an ability to comprehend the *purpose* of the text, which is a vital part of its context." Scalia & Garner, *supra*, at 33. *Christopher* decided the case by analyzing the text in context. And although Judge O'Malley relies on *Christopher* to assert that "[v]eterans deserve no less protection than low wage employees," O'Malley Dissent at 12, *Christopher* actually held in favor of the employers.

Importantly, *Boone* itself, the progenitor of the pro-veteran canon, followed a similar path—relying on the text to reject the veteran's interpretation by applying descriptive "[c]anons of statutory construction." 319 U.S. at 565 (reasoning that "we should not needlessly render as

meaningless the [statutory] language"). Accordingly, the origin of the pro-veteran canon as a species of the liberal-construction principle confirms that it belongs at the end of a descriptive textual analysis when that analysis does not yield a best meaning.

## 2.  THE *BROWN* FORMULATION

The more recent "interpretive doubt" formulation of the pro-veteran canon, which was articulated in *Brown*, does nothing to elevate the canon in the interpretive hierarchy. To the contrary, as a logical matter, if "interpretive doubt" is a precondition for applying the canon, as *Brown* declares, the existence of interpretive doubt must be determined without employing the canon. Otherwise, circularity results.

The *Brown* formulation strongly resembles the rule of lenity, moreover, and that rule is considered at the end of the analysis. In the words of Chief Justice Marshall, a court should not apply the rule unless the statute remains ambiguous "[a]fter seiz[ing] every thing from which aid can be derived." *Moskal*, 498 U.S. at 108 (quoting *United States v. Fisher*, 2 Cranch 358, 386 (1805)) (alterations in original and internal quotation marks omitted). Last year in *Shular v. United States*, for example, the Court concluded that the statute's text and context left "no ambiguity for the rule of lenity to resolve" after a textual analysis. 140 S. Ct. 779, 787 (2020). Speaking for the unanimous Court, Justice Ginsburg explained that the rule "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *Id.* Similarly in *Yates v. United States*, the Court performed a textual analysis—featuring the canon against surplusage, *noscitur a sociis*, and *ejusdem generis*—and only after doing so buttressed its interpretation with a remark that "if our recourse to traditional tools of statutory construction leaves any doubt[,] . . . we would invoke the rule [of lenity]." 574 U.S. 528, 543–47 (2015). And again, as *Boone* did with

the older formulation of the pro-veteran canon, *Brown* similarly treated this more recent "interpretive doubt" formulation as subsidiary to the text and relevant context. In *Brown*, the Court declined to apply the canon because the statute was unambiguous. 513 U.S. at 117–18 ("The most, then, that the Government could claim . . . is the existence of an ambiguity . . . (assuming that such a resolution would be possible after applying the rule that interpretive doubt is to be resolved in the veteran's favor). But the Government cannot plausibly make even this claim here." (citation omitted)).

What's more, contrary to Judge O'Malley's suggestion that the pro-veteran canon in *Brown* did not rank below descriptive canons, O'Malley Dissent at 14–16, the Court in *Brown* concluded that the statute was not ambiguous *by applying a descriptive canon*: the "presumption that a given term is used to mean the same thing throughout a statute," which is "at its most vigorous when a term is repeated within a given sentence." 513 U.S. at 18. *Brown* came just three years after *St. Vincent's Hospital* similarly held for the veteran based on a descriptive analysis of the statute. 502 U.S. at 218–22. There, the Court's reasoning proceeded in two steps. First, the Court announced that it would "start with the text." *Id.* at 218. Second, it assessed the "context." *Id.* at 221 ("[W]e do nothing more, of course, than follow the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." (citation omitted)). In a footnote, the Court in *St. Vincent's Hospital* surmised that even if a neighboring subsection of the statute "unsettled the significance of [the provision's] drafting," the Court "would ultimately read the provision in [the veteran's] favor." *Id.* n.9.

Accordingly, just as the Court has "declined to deem a statute 'ambiguous' for purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the Government," *see Moskal*, 498 U.S. at 108, it stands to reason that we should decline to find

ambiguity for purposes of the pro-veteran canon merely because a veteran-friendly construction is possible. The pro-veteran canon—like the rule of lenity—"comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration." *See Callanan v. United States*, 364 U.S. 587, 596 (1961).[8]

## C.  CONGRESS'S ACTIVE ROLE

Congress's active engagement in this area of law is a further reason we should constrain ourselves to apply the pro-veteran canon only after descriptive tools do not yield

---

[8]    Judge O'Malley attempts to distinguish the pro-veteran canon from the rule of lenity by arguing that, while the rule of lenity is a "judge-made tie breaker[] implementing *judicial* policy choices," the pro-veteran canon is a "rule[] implementing congressional intent." O'Malley Dissent at 18. First, both canons are judge-made. Second, conceptualizing and applying a broad notion of "congressional intent" at the "liberal construction" level of generality is also a judicial policy choice. *See* 3 *Sutherland Statutory Construction* § 58:1 (8th ed.) ("In cases of unresolvable ambiguity, [courts] additionally may rely on the presumptions embodied by strict and liberal construction as tie-breakers of last resort, a 'thumb on the scale' that allows them to fulfill their adjudicatory mandate." (footnote omitted)); *id.* ("[S]trict and liberal approaches to statutory language are normative, explicitly preferring certain interpretive results over others."). Indeed, resolving ambiguity with the pro-veteran canon instead of *Auer* in this case would have implemented one judicial policy choice over another. *See Kisor v. Shulkin*, 880 F.3d 1378, 1379 (Fed. Cir. 2018) (O'Malley, J., dissenting from denial of rehearing en banc) ("When these two doctrines pull in different directions, it is *Auer* deference that must give way.").

a best meaning.[9]  Even if we accept the theory that the pro-veteran canon is justified as a proxy for congressional intent, Congress's undeniably active role in veterans' benefits law mitigates the concern that we will frustrate Congress's efforts by declining to apply at the outset a highly generalized veteran-friendly policy that is above and beyond the specific policies expressed in the text.

If the canon's predicate is Congress's intent, one thing that is clear about Congress's intent in this area is that it means to make very specific prescriptions, taking account of competing policies, and to monitor their implementation and actively adjust its laws as it deems necessary.  Congress did not write a highly general law and leave the rest to the judiciary (or the Secretary).  Far from it.  There are few areas in which Congress has been so consistently proactive as it is here, in pursuit of its mission to ensure that our veterans are cared for.  Indeed, both the House and the Senate have committees created exclusively for, and dedicated exclusively to, overseeing veterans' affairs.  Senator Tester (MT), chairman of the Senate committee, has expressed that "Congress must hold the Department of Veterans Affairs (VA) accountable in delivering timely, quality, and robust care and benefits to all veterans."[10] Similarly, Senator Moran (KS), ranking member of that committee, has explained that the committee's "top priority is to make sure we take care of our veterans who have dedicated their lives to serving our country" and has stated his intention to "work to make certain the U.S. Department of

---

[9]    This part of my opinion is directed to underscoring the proper *order* of analysis.  Contrary to Judge O'Malley's assertion, it is not an argument "*not* to consider the pro-veteran canon of construction when considering a less than clear term."  *See* O'Malley Dissent at 11 n.3.

[10]    U.S. Senate Committee on Veterans' Aff., https://www.veterans.senate.gov/about/chairman.

Veterans Affairs (VA) implements the Congressional reforms laid out in the VA MISSION Act bringing the VA into the 21st century and providing veterans with the best possible care and services."[11]  And they have been busy.  Indeed, a quick search reveals that no fewer than 134 pieces of legislation originating in these two committees have been signed into law over the last decade (i.e., during the six most recent Congresses).[12]

Indeed, as we have previously pointed out, "Congress has repeatedly passed legislation on veterans' benefits, including legislation specifically overruling judicial and agency interpretations of the veterans' benefits statutes." *Sears v. Principi*, 349 F.3d 1326, 1330 (Fed. Cir. 2003).  For example, Congress enacted the Veterans Claims Assistance Act of 2000 ("VCAA") to legislatively overturn a 1999 decision of the Court of Appeals for Veterans Claims, thereby "eliminat[ing] the 'well-grounded' claim requirement" applied in that decision.  *Mayfield v. Nicholson*, 499 F.3d 1317, 1319 (Fed. Cir. 2007); *see also Webster v. Shinseki*, 428 F. App'x 976, 978 (Fed. Cir. 2011) (recognizing that the "well-grounded claim" rule "has been legislatively overturned").[13]  In other words, Congress has been

---

[11]  U.S. Senate Committee on Veterans' Aff., https://www.veterans.senate.gov/about/ranking.

[12]  https://www.congress.gov/ (legislation search).

[13]  In the evidentiary context, Congress has expressly prescribed a scale-tipping rule in favor of veterans. 38 U.S.C. § 5107(b) ("When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant.").  And in other contexts Congress has set forth a rule of statutory interpretation.  *See, e.g.*, 21 U.S.C. § 853(o) (statute involving criminal forfeitures instructing that "[t]he provisions of

proactively working to get veterans' issues right—including by intervening when it believes courts and agencies get them wrong. This institutionalized system, therefore, suggests a less imperative need for our thumb on a scale that Congress continuously monitors and calibrates.[14]

## II.  RESPONSES TO THE DISSENTS

I have several points of disagreement with the conceptions of the pro-veteran canon advanced by the dissenting opinions in this case. First, the dissenting opinions disregard the hierarchy of interpretive tools—in particular, the distinction between descriptive and normative canons. *See, e.g.*, Panel Dissent at 3 (asserting that "the pro-veteran canon must be weighed *alongside* the other traditional tools" (emphasis added)); O'Malley Dissent at 18 (concluding that "the pro-veteran canon should be used *alongside* traditional tools" (emphasis added)). For example, Judge O'Malley faults the Majority for using "some, but not all, canons of construction" and asserts that the Majority did "not pretend to end its analysis with the language." *Id.* at 19. But both of these concerns are addressed merely by recognizing that the interpretive tools the Majority applied were descriptive, rather than normative— and therefore were just a part of the Majority's analysis of the language. When these tools yielded a best meaning,

---

this section shall be liberally construed to effectuate its remedial purposes"). But even in the latter situation, the Court has explained that such an instruction "only serves as an aid for resolving an ambiguity; it is not to be used to beget one." *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993) (cleaned up). Notably, Congress has issued no such instruction here.

[14]   For further evidence on this point, see Judge O'Malley's detailed history of Congress's activity in veterans law, O'Malley Dissent at 8–10.

there was no need to reach the normative pro-veteran canon.

Second, placing the pro-veteran canon on par with descriptive canons departs from the Supreme Court's text-first rule, which is the basis for applying descriptive canons before normative canons like the pro-veteran canon. Indeed, although Judge Reyna acknowledges that the canon "cannot override plain text" and that "plain text defeats all other tools of construction," Panel Dissent at 21 & 22 n.13 (collecting cases), he appears to accept only one textual constraint: that the text not "preclude[]" or "expressly exclude" the veteran's interpretation. *Id.* at 22; *see also* O'Malley Dissent at 17 ("Where differing plausible, reasonable interpretations of the terms of a regulation are *possible*, Congress has spoken: it wants veterans' benefits to be administered in a 'pro-claimant' manner." (emphasis added)). So far as I can tell, this approach would permit a court to adopt a veteran-friendly interpretation so long as it is not *expressly ruled out* by the text—and even if it is less plausible than the textually derived best meaning of a provision. Because "most statutes are ambiguous to some degree" (at least, if the analysis stops short of a full evaluation of the context and focuses only on particular words in isolation), *see Muscarello v. United States*, 524 U.S. 125, 138 (1998), the approach advocated by my dissenting colleagues would displace the more balanced determinations reflected in the statute as Congress chose to write it.

Third, and for similar reasons, I disagree that we should consider the pro-veteran canon when determining "whether interpretative doubt exists." Panel Dissent at 3. Presumably, that would mean that even if the text, context, and descriptive canons yield a best meaning, the pro-veteran canon could inject doubt as to whether that meaning is best—at which point the doubt would be resolved in the veteran's favor. In short, the pro-veteran canon could trump the best meaning derived from the text. Again, this

departs from the Supreme Court's insistence that the text comes first.

Fourth, the dissenting opinions would apply the canon as a liberal-construction principle (resembling the *Boone* formulation). *E.g.*, Panel Dissent at 24 (arguing that the "governing statutes and regulations should always be construed liberally within the bounds of their text"); O'Malley Dissent at 10 (arguing that Congress "wanted all aspects of the [Veterans' Judicial Review Act] to be liberally construed in favor of the veterans"). And if the pro-veteran canon is simply a liberal-construction principle as my dissenting colleagues argue, this is further confirmation that—for reasons already stated—it is best considered only after a descriptive textual analysis does not yield a best meaning. *See supra* Part I.B.1.

### III. TENSION WITH *CHEVRON* AND *AUER*

Last, I recognize that the Supreme Court's *Chevron* and *Auer* frameworks present a difficult and unresolved challenge—as they in many cases will create tension with the pro-veteran canon. This tension arises because both the pro-veteran canon and these deference doctrines are triggered by ambiguity. For example, if the pro-veteran canon is used at step one of *Chevron* to resolve ambiguity in a veteran's favor, then step two of *Chevron* will never be reached.[15] This raises the question of how to decide what gets triggered first. Although the Supreme Court has applied various canons at step one of *Chevron*—indicating that some canons are "traditional tools" of interpretation

---

[15]    I note, however, that this tension arises only where the ambiguity at issue is in the textual meaning of a statute or regulation—not where a regulation simply fills a gap left by Congress for agency discretion. *See Terry v. Principi*, 340 F.3d 1378, 1383 (Fed. Cir. 2003) (deferring under *Chevron* to fill a gap instead of applying the canon).

that belong at that step, *Arangure*, 911 F.3d at 339–40 (collecting cases), the Court did not attempt to address this difficulty in *Brown* or any other case involving the pro-veteran canon (including this one).[16]  Consequently, "[i]t is not clear where the *Brown* canon fits within the *Chevron* framework, or whether it should be part of the *Chevron* analysis at all." *Heino v. Shinseki*, 683 F.3d 1372, 1379 n.8 (Fed. Cir. 2012).

Whether a canon applies before deferring to an agency likely depends on the character of the canon, measured against the rationales underpinning the *Chevron* and *Auer* frameworks.  *See generally Arangure*, 911 F.3d at 339–42.  For example, there is "broad agreement" that canons which "clearly and exclusively serve descriptive, rather than normative, purposes . . . belong in step one" of *Chevron*—which "has the same goal: determining the meaning of the statute." *Id.* at 340–41.  Normative canons present harder issues.  For normative canons triggered by ambiguity, the answer may depend on whether the ambiguity is of the type where Congress has delegated its resolution to the courts or an agency.  *See* Barrett, *supra*, at 123 (explaining that the rule of lenity may be justified under the theory that a court's "best understanding of Congress's instructions is that Congress left the problem to her").

I do not attempt to resolve this quandary here as to the pro-veteran canon.  Further guidance is necessary to reconcile these competing doctrines.  But setting aside the question of which doctrine gets triggered by an ambiguous statute *first*, it's worth reiterating the rigorous interpretive

---

[16]  This difficulty is not limited to the pro-veteran canon.  For example, while the D.C. Circuit has prioritized the Indian canon over *Chevron* step two, the Ninth Circuit has not.  *Compare Cobell v. Norton*, 240 F.3d 1081, 1100–01 (D.C. Cir. 2001), *with Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015).

process that the Court has prescribed *before* finding ambiguity.  On this point, the Court did not mince words in its recent pronouncement about the term "ambiguous": "when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation."  *Kisor*, 139 S. Ct. at 2414.  A court must "exhaust" these "traditional tools," finding ambiguity "only when that legal toolkit is empty and the interpretive question still has no single right answer."  *Id.* at 2415.  A court therefore "cannot wave the ambiguity flag just because it found the regulation impenetrable on first read."  *Id.*  Rather, "hard interpretive conundrums, even relating to complex rules, can often be solved."  *Id.*  Indeed, "[i]f a reviewing court employs all of the traditional tools of construction, the court will almost always reach a conclusion about the best interpretation of the regulation at issue."  *Id.* at 2448 (Kavanaugh, J., concurring in the judgment).  Then there is "no reason or basis to put a thumb on the scale," whether in deference to an agency or in a veteran's favor.  *See id.*

## CONCLUSION

The Supreme Court has said that we are not at liberty to merely assume that "any result consistent with . . . the statute's overarching goal must be the law" as some versions of a liberal-construction principle assume.  *Henson*, 137 S. Ct. at 1725.  We must "presume more modestly instead that the legislature says what it means and means what it says."  *Id.* (cleaned up).  Undoubtedly the "entire [veterans-benefits] scheme is imbued with special beneficence from a grateful sovereign."  *Bailey v. West*, 160 F.3d 1360, 1370 (Fed. Cir. 1998) (Michel, J., concurring); *see also Martin v. O'Rourke*, 891 F.3d 1338, 1352 (Fed. Cir. 2018) (Moore, J., concurring) ("The men and women in these cases protected this country and the freedoms we hold dear. . . .").  Our first order of business, however, and often our last, is to apply the properly understood words Congress chose for that scheme.  It's hard to see how fidelity to

those words "rends the overarching fabric of protection woven by Congress." Panel Dissent at 3. The words *are* the fabric. Consistent with the principles articulated above, we should consider the pro-veteran canon only if, after exhausting all applicable descriptive tools in search of the provision's best meaning, a range of plausible interpretations remains, none of them fairly described as the best. I concur in the denial of rehearing en banc.

# United States Court of Appeals
# for the Federal Circuit

---

**JAMES L. KISOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2016-1929

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 14-2811, Senior Judge Alan G. Lance, Sr.

---

HUGHES, *Circuit Judge*, with whom WALLACH, *Circuit Judge*, joins, concurring in the denial of rehearing en banc.

I concur in the denial of en banc rehearing. I also agree with much of what Chief Judge Prost has written and specifically join Part I.B–C and Part II of her opinion concurring in the denial of en banc rehearing. I write separately to note my further views and, particularly, my agreement with our court's current precedent regarding the role of *Chevron* and *Auer* in interpreting veterans' benefits statutes.

In the years following *Chevron, Gardner*, and *Auer*, this court has on numerous occasions decided appeals from denials of benefits in which the VA's interpretation of a

statutory or regulatory provision has been challenged by a veteran citing the pro-veteran canon. From these decisions, we have established a clear framework for interpreting statutory and regulatory provisions in the veterans' benefits context where the VA argues that its interpretation is owed deference. That precedent is correct and does not warrant rehearing in any aspect.

The first step, as in all cases where *Chevron* deference is asserted, is to determine whether Congress has directly spoken to the precise question at issue. This court has done so by "first carefully investigat[ing] the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable . . . by employing the traditional tools of statutory construction." *Boyer v. West*, 210 F.3d 1351, 1355 (2000) (quoting *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)). These tools require "examin[ing] the statute's text, structure, and legislative history and apply[ing] the relevant canons of interpretation." *Id.* If we determine that the statute "plainly speaks to the issue," that is the end of the analysis. *Id.* at 1352. This court has consistently held that the pro-veteran canon does not apply at this juncture. *Id.* at 1355 ("A veteran 'cannot rely upon the generous spirit that suffuses the law generally to override the clear meaning of a particular provision.'") (quoting *Smith v. Brown*, 35 F.3d 1516, 1526 (Fed. Cir. 1994)). Instead, we have repeatedly stated that we must first find a statutory provision ambiguous before there can be "interpretative doubt" to be resolved in the veteran's favor. *Nielson v. Shinseki*, 607 F.3d 802, 808 n.4 (Fed. Cir. 2010) (collecting cases). But even then, we have never looked first to the pro-veteran canon to resolve questions of ambiguity.

Instead, once we have determined that the statute is silent on the issue or is genuinely ambiguous, we then determine whether the VA has promulgated a reasonable interpretation that is owed deference, typically (though not exclusively) in the form of a duly published regulation. We

then apply the same methodology as explained above, employing all the "standard tools of interpretation," *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019), including "the text, structure, history, and purpose of a regulation," *id.* at 2415, in determining whether that regulation has a plain meaning or whether it is genuinely ambiguous. *See also O'Bryan v. McDonald*, 771 F.3d 1376, 1379 (Fed. Cir. 2014). If the regulation is plain and a reasonable interpretation of the ambiguous statute, then the VA is entitled to *Chevron* deference. *Sears v. Principi*, 349 F.3d 1326, 1330 (Fed. Cir. 2003); *Degmetich v. Brown*, 104 F.3d 1328, 1332 (Fed. Cir. 1997).

If we cannot discern the plain meaning of the regulation, we proceed to determine whether the VA's interpretation of its regulation is owed deference under *Auer*. As the Supreme Court explained in its decision remanding this case, an agency's interpretation is owed deference under *Auer* only if it is reasonable, implicates the agency's substantive expertise, and reflects the agency's "fair and considered judgment" rather than merely a "convenient litigating position or *post hoc* rationalization." *Kisor*, 139 S.Ct. at 2417. If the VA's interpretation satisfies each of these prongs, then it is owed deference even over an alternative interpretation that is arguably more generous to veterans.[1]

---

[1]    It is not clear—from either our precedent or the Supreme Court's limited discussions of the pro-veteran canon—whether interpretative doubt is to be resolved in favor of the specific veteran before the court in a given appeal or in favor of veterans in general. To the extent that the pro-veteran canon contemplates the interests of the latter, the agency is in the better position vis-à-vis this court to determine how to interpret its regulations to favor veterans seeking or receiving benefits as a group.

We have previously, and correctly in my view, held that if the conditions for either *Chevron* or *Auer* deference are met, then the VA is entitled to deference, without resort to the pro-veteran canon. *See, e.g., Smith v. Shinseki*, 647 F.3d 1380, 1385 (Fed. Cir. 2011); *Smith v. Nicholson*, 451 F.3d 1344, 1349–51 (Fed. Cir. 2006); *Sears*, 349 F.3d at 1331–32. The Supreme Court's decision in *Kisor* does not require alteration of this precedent, but simply clarifies the conditions for application of *Auer*.

If the VA's interpretation fails to satisfy any of the requirements for deference, then the interpretative doubt in the statute or regulation has not been resolved by the agency and the pro-veteran canon requires that we resolve the ambiguity in favor of the veteran. *See Hudgens v. McDonald*, 823 F.3d 630, 639 (Fed. Cir. 2016). To hold that the pro-veteran canon applies at any earlier step in the *Chevron* or *Auer* analysis is to hold that the VA, alone among the executive agencies, is not entitled to deference in interpreting its regulations and the statutes Congress has charged it with administering.[2] This position would be anomalous to say the least and has been flatly rejected by this court. *Sears*, 349 F.3d at 1331–32; *Nat'l Org. of Veterans Advocates, Inc., v. Sec'y of Veterans Affairs*, 809 F.3d 1359, 1363 (Fed. Cir. 2016).

---

[2]    The late Justice Scalia, in an address to the 12th CAVC Judicial Conference in 2013, suggested that *Chevron* and the pro-veteran canon are incompatible and opined that this court had correctly rejected the view that *Chevron* does not apply to the VA. Chadwick J. Harper, *Give Veterans the Benefit of the Doubt:* Chevron, Auer, *and the Veteran's Canon*, 42 HARV. J.L. & PUB. POL'Y 950 n.128 (citing Ct. of Appeals for Veterans Claims Bar Assoc., *Justice Scalia Headlines the Twelfth CAVC Judicial Conference*, VETERANS L.J. 1, 1 (Summer 2013)).

Of course, most of these issues need not be resolved here. The panel majority concluded that the regulation at issue was clear and therefore there was no need to reach any questions of deference or the pro-veteran canon. I do not believe that regulation-specific determination warrants en banc rehearing and concur in the denial.

# United States Court of Appeals
# for the Federal Circuit

---

**JAMES L. KISOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2016-1929

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 14-2811, Senior Judge Alan G. Lance, Sr.

---

DYK, *Circuit Judge*, concurring in the denial of rehearing en banc.

The role of the veteran's canon in statutory and regulatory interpretation is an important issue. If that issue were presented in this case, I would generally agree with Chief Judge Prost's analysis. But, in my view, that canon simply is not relevant to the disposition of this case. Resolution of the interpretative issue here does not depend on the application of the veteran's canon or other canons of construction, but on a plain reading of the language of the regulation.

The regulation states that "if VA receives or associates with the claims file relevant official service department

records that existed and had not been associated with the claims file when VA first decided the claim, VA will reconsider the claim." 38 C.F.R. § 3.156(c)(1). The question is what constitutes "relevant" records.

## I

Here, there was an original rating decision in 1983 denying benefits for post-traumatic stress disorder on the basis that the veteran was not diagnosed with PTSD. *See* J.A. 22–23. There was a later decision in 2007, concluding that the veteran did have PTSD and granting benefits based in part on service department records received by the VA after the original 1983 decision because these records verified an in-service stressor (an additional requirement for a PTSD award). *See* Majority Op. 6–7; J.A. 30–34; *see also AZ v. Shinseki*, 731 F.3d 1303, 1310 (Fed. Cir. 2013) (listing elements for service connection for a PTSD claim).

An earlier effective date under 38 C.F.R. § 3.156(c) was denied on the grounds that the newly received service department records were not relevant. The Board and the Veterans Court concluded that "relevant" records are those relevant to the earlier decision's basis for denying benefits, and here, the records were not relevant because they did not pertain to the basis of the 1983 denial of benefits, which was the lack of a PTSD diagnosis rather than the lack of a stressor. *See* J.A. 3–4, 90–91.

The panel agrees that the term "relevant" for the purposes of 38 C.F.R. § 3.156(c)(1) should be interpreted consistently with 38 U.S.C. § 5103A, the statutory basis for the VA's duty to assist. *See* Majority Op. 13; Dissenting Op. 8, 10. Section 5103A provides that "[t]he [VA] shall make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate the claimant's claim for a benefit under a law administered by the [VA]." 38 U.S.C. § 5103A(a)(1) (emphasis added). As the panel majority appears to admit, "[r]elevant records for the purpose of § 5103A are those records that relate to the injury for

which the claimant is seeking benefits and <u>have a reasonable possibility of helping to substantiate the veteran's claim</u>." *Golz v. Shinseki*, 590 F.3d 1317, 1321 (Fed. Cir. 2010) (emphasis added); *see* Majority Op. 13.  In other words, relevant records are those that help in "substantiat[ing] the claimant's claim for a benefit," 38 U.S.C. § 5103A(a)(1), not just those that "undermin[e]" some prior decision that denied that benefit, *see* Majority Op. 10. Short of an explicit statutory definition of "relevant," it can hardly be clearer what "relevant" means.

Similarly, the language of 38 C.F.R. § 3.156(c) makes clear that relevant records are those relevant to the decision awarding compensation—not the prior decision.  The regulation states that the earlier decision is set aside and an earlier effective date is granted if "[a]n award" is "made based all or in part" on "relevant official service department records that existed and had not been associated with the claims file when VA first decided the claim."  38 C.F.R. § 3.156(c)(1), (3).

The language of the regulation does not restrict the availability of an earlier effective date only to records that speak to the basis for the prior decision.  If the agency intended such a restriction, the regulation could easily state that "[a]n award made based all or in part on records <u>relevant to the ground of the prior decision</u>" qualifies for an earlier effective date.  Instead, the rule makes relevancy turn on whether the award was "made based all or in part" on the records.  38 C.F.R. § 3.156(c)(3).  Thus, plain language leads to the rather obvious interpretation of the regulation—that it refers to records relevant to the service connection claim.

## II

There is language in the panel opinion that appears to reject the correct interpretation of "relevant," *see, e.g.*, Majority Op. 12–13, but I read the panel opinion as taking a more nuanced view of what is relevant.  The panel holds

that service records are only not relevant if they relate to "a matter that was not in dispute" (i.e., conceded) in the earlier VA decision. Majority Op. 15.[1] Here, the panel concluded that the issue to which the records relate (i.e., whether there was an in-service stressor) was not in dispute; hence, the records are not relevant. The dissent and majority appear to differ as to whether the stressor was in dispute, *see id.*; Dissenting Op. 16, and it may be that the majority is incorrect, but that is hardly a ground for en banc review. Nor does the majority's view that records must relate to a disputed issue (based on the plain language of 38 C.F.R. § 3.156(c) that the award must be "based all or in part on" the newly discovered records, *see* Majority Op. 12–13), constitute a matter warranting en banc review. Service department records relevant to a claim for benefits will continue to provide grounds for reconsideration (and an earlier effective date) if they relate to a disputed claim element. The role of the veteran's canon, not being a pertinent issue here, must await another day and another case.

---

[1]    The majority's opinion states:

We therefore conclude that the Board did not err in holding that the records cited by Mr. Kisor were not "relevant" because they did not pertain to the basis of the 1983 denial, the lack of a diagnosis of PTSD. The records added nothing to the case because Mr. Kisor has not shown that they bore, directly or indirectly, on any matter relating to entitlement to service connection for PTSD, other than a matter that was not in dispute: the presence of an in-service stressor.

Majority Op. 15.

# United States Court of Appeals for the Federal Circuit

---

**JAMES L. KISOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2016-1929

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 14-2811, Senior Judge Alan G. Lance, Sr.

---

O'MALLEY, *Circuit Judge*, with whom NEWMAN, MOORE, and REYNA, *Circuit Judges*, join, dissenting from the denial of the petition for rehearing en banc.

This case returned to us after a trip to the Supreme Court. I am surprised that the panel majority does not believe the Supreme Court's opinion compels judgment in Mr. Kisor's favor. I am also surprised by the analytical hoops through which the panel majority has jumped to reinforce its decision to rule against the veteran. And that the majority went to such great lengths to do so despite the remedial context in which Mr. Kisor's claim arose.

The procedural history of this case is important to understanding how we have arrived at this point and why we need to retreat from it.

The veteran's case turns on the meaning of the word relevant in 38 C.F.R. § 3.156(c)(1). If the term is given its common and well-understood meaning, the veteran likely is entitled to an additional twenty-six years of benefits. If the term is given the contorted meaning now dictated by the majority, he decidedly is not.

The panel majority initially held that the word "relevant" in § 3.156(c)(1) is ambiguous. *See Kisor v. Shulkin*, 869 F.3d 1360, 1367 (Fed. Cir. 2017) ("*Kisor I*"). In fact, it concluded it was insolubly so. The panel said that "[i]n our view, the regulation is vague as to the scope of the word, *and canons of construction* do not reveal its meaning." *Id.* at 1367 (emphasis added). More specifically, it explained "§ 3.156(c)(1) does not specify whether 'relevant' records are those casting doubt on the agency's prior rating decision, those relating to the veteran's claim more broadly, or some other standard." *Id.* It concluded that "[t]his uncertainty in application suggests that the regulation is ambiguous." *Id.* The panel then emphasized that the parties' "varying, alternative definitions" of the term "underscore[d] § 3.156(c)(1)'s ambiguity" because neither party's position was unreasonable. *Id.* at 1367–68 ("Both parties insist that the plain regulatory language supports their case, and neither party's position strikes us as unreasonable.").

Reasoning that the Board's interpretation of the regulation was not "plainly erroneous or inconsistent" with the VA's regulatory framework, the panel concluded that the only way to resolve the parties' dispute was to rely on the principle of deference outlined in *Auer v. Robbins*, 519 U.S. 452 (1997). *Id.* at 1369. It thus concluded that the judge-made policy of giving deference to an agency's interpretation of its own regulations meant the insoluble interpretive

tie with which it was faced went to the VA. The veteran lost.

Notably, before finding an ambiguity in the regulatory text and resorting to *Auer*, the panel did not consider the pro-veteran canon—the "rule that interpretive doubt is to be resolved in the veteran's favor," *Brown v. Gardner,* 513 U.S. 115, 117–118 (1994); the "canon that the provisions for benefits to members of the armed services are to be construed in the beneficiaries' favor," *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 441 (2011) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220–221, n.9 (1991)). Mr. Kisor sought rehearing en banc before our court, which we denied, over the objection of three of our judges. *Kisor v. Shulkin*, 880 F.3d 1378 (Fed. Cir. 2018). Mr. Kisor then sought certiorari, asking the Supreme Court to overrule *Auer*, or at least clarify that resort to *Auer* is inappropriate where the pro-veteran canon of construction could resolve the ambiguity in the veteran's favor.

The Supreme Court granted cert on the first question. *See Kisor v. Wilkie*, 139 S. Ct. 657 (2018) (mem.). While the Supreme Court refused to do away with *Auer*, it dramatically circumscribed the circumstances in which a court may resort to it. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) ("*Kisor II*"). Importantly, the Court explained that, before a regulation may be deemed "genuinely ambiguous" enough for *Auer* deference to come into play, "*all* the 'traditional tools' of construction" must be employed in assessing the regulation. *Id.* at 2415 (emphasis added). It explained that "only when that legal toolkit is empty and the interpretive question still has no single right answer can a judge conclude that it is 'more [one] of policy than of law.'" *Id.* (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696 (1991)).

The case was then remanded. It would seem that the resolution on remand would have been easy. The panel originally found the regulation insolubly ambiguous

without having considered the pro-veteran canon of construction. Applying that canon in this court's "legal toolkit" to a circumstance in which there were two reasonable constructions of the regulation, and without the option of *Auer*, the result should have been that the veteran's proposed construction prevailed. The veteran should have won.

Surprisingly, the majority instead concluded that the regulation is not ambiguous at all. *Kisor v. Wilkie*, 969 F.3d 1333, 1338 (Fed. Cir. 2020) ("*Kisor III*"). According to the majority at that point, "relevant" "ha[d] only one reasonable meaning"—the one proffered by the VA. *Id.* at 1338–1339 ("[T]he record must speak to a matter in issue, in other words, a matter in dispute."). The majority never mentioned the "uncertainty in application" with which it had been concerned in *Kisor I*. It simply concluded that it no longer thought Mr. Kisor's proposed definition struck it as reasonable because it said the service records did not speak "directly or indirectly" to his non-diagnosis of PTSD. *Id.* at 1340. The panel majority conceded that the new records contained substantial additional information regarding Mr. Kisor's combat experiences during Operation Moon. *Id.* at 1341. Indeed, it conceded that the records contained "credible supporting evidence that the claimed stressor occurred." *Id.* (citation omitted). But it still somehow found the records irrelevant. *Id.* The majority then concluded that, because it no longer found the regulation ambiguous, it did not need to consider the pro-veteran canon of construction. *Id.* at 1342. According to the majority, the pro-veteran canon "only applies in the situation where the statute or regulation at issue is ambiguous."[1]

---

[1]    The Concurrence to denial of en banc by Chief Judge Prost ("Prost Concurrence") questions whether the pro-veteran canon should apply during regulatory interpretation. Prost Concurrence at 3 n.2. But nothing about

*Id.* (quoting *Paralyzed Veterans of Am. v. Sec'y of Veterans Affs.*, 345 F.3d 1334, 1340 (Fed. Cir. 2003)). The veteran lost again.

Mr. Kisor again petitioned our court to rehear this case en banc. *See* Pet. for Reh'g En Banc, *Kisor v. McDonough*, No. 16-1929 (Fed. Cir. Sept. 28, 2020), ECF No. 76. In doing so, he had the support of several amici who, alongside him, contended that the pro-veteran canon of construction was an important interpretive canon that was to be employed at step one of the analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)—that is, to be applied *along the way* to determining whether a true ambiguity exists within the meaning of *Kisor II*. In response, the panel majority pulled *Kisor III* back. It has now issued a modified opinion with a third set of rationales for its ruling against the veteran. *See* Majority Modified Op. ("*Kisor IV*").

In its modified opinion, the panel majority now asserts that the pro-veteran canon of construction is not to be considered unless there is "interpretive doubt" in the panel's mind after "use of ordinary textual analysis tools," which it says *do not include* the pro-veteran canon. *Id.* at 16. And, the majority states that, using such tools, it finds that

---

the regulatory context undermines the pro-veteran canon's core justification—the special solicitude for those persons who "have been obliged to drop their own affairs to take up the burdens of the nation." *Boone v. Lightner*, 319 U.S. 561, 575 (1943). And "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). We have never differentiated between the interpretive exercise employed at the statutory level and that employed at the regulatory level. Neither has the Supreme Court. I see no reason why we should do so now.

"relevant" records means records that are "relevant to the issue that was dispositive against the veteran in the VA adjudication of the claim sought to be reconsidered and, in that way, bear on the outcome of the case." *Id.* at 9. The panel majority concludes once more that Mr. Kisor's service records do not satisfy that definition of relevance. The veteran loses again.

Judge Reyna's dissent from *Kisor IV* explains in detail why, on this record—where the examiner originally found the absence of PTSD in part due to skepticism about what Mr. Kisor claimed about his in-service stressors—evidence of *in combat* and other substantial in-service stressors must certainly be relevant to his PTSD diagnosis. *See Kisor IV* Dissent Modified Op. at 15–20. PTSD is a differential diagnosis after all, that turns, in large measure, on the nature and existence of identified stressors. The majority's effort to render in-service records of those stressors irrelevant because the denial of Mr. Kisor's claim for benefits was premised on the absence of a diagnosis of PTSD and not on the absence of an in-service connection to his alleged disability is mental gymnastics. Where skepticism that stressors existed resulted in a non-diagnosis of PTSD, detailed records cataloging such stressors must certainly be "relevant" to that non-diagnosis, under any construction of that term. I defer to Judge Reyna's thoughtful discussion of that factual point in his panel dissent.

I write separately to address (1) the panel majority's dismissive treatment of the pro-veteran canon of construction and (2) emphasize that the panel's tortured definition of "relevant" in § 3.156(c)(1) is out of step with all common understandings of that term and is unsupported by any meaningful text-based interpretive analysis. I believe the veteran should win this time.

## I.

The pro-veteran canon of construction is not meant to be an afterthought. It is a tool in the interpretive toolkit

that aids in gleaning congressional intent where the plain text of the statute or regulation does not clearly answer the question at hand.[2]  The pro-veteran canon has occupied a place in Supreme Court jurisprudence for almost eighty years.  *See, e.g., Boone v. Lightner*, 319 U.S. 561, 575 (1943) ("The Soldiers' and Sailors' Civil Relief Act is always to be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation."); *see also Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946) ("Our problem is to construe the separate provisions of the [Selective Service] Act as parts of an organic whole and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits.").

It is against this common law backdrop that Congress passed the Veterans Judicial Review Act ("VJRA").  Veterans Judicial Review Act, Pub. L. No. 100–687, § 301, 102 Stat. 4105, 4113–22 (1988) (codified as renumbered at 38 U.S.C. §§ 7251–92); *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991) (stating expressly that the Supreme Court presumes that Congress legislates with an understanding of the pro-veteran "interpretive principle[]") (citing *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991) ("It is presumable that Congress legislates with knowledge of our basic rules of statutory construction. . . .")); *see also Lofton v. West*, 198 F.3d 846, 850 (Fed. Cir. 1999) ("Congress legislates against a common law background . . . ."); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that

---

[2]    "We're all textualists now."  Harvard Law School, *The Antonin Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes*, YOUTUBE (Nov. 25, 2015) https://www.youtube.com/watch?v=dpEtszFT0Tg.

the principle will apply except 'when a statutory purpose to the contrary is evident.'") (citing *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)).

Congress created the Veterans Administration (the agency that preceded the VA) in 1930, *see* Act of July 3, 1930, Pub. L. No. 71-536, ch. 863, § 1, 46 Stat. 1016, and initially prohibited judicial review of the agency's decisions concerning veterans' benefits, *see* Act of Mar. 20, 1933, ch. 3, § 5, 48 Stat. 9 (codified as amended at 38 U.S.C. § 211(a) (1988)) (repealed 1988). The VA decisions concerning veterans' benefits existed in a state of "splendid isolation" from judicial review. *Brown*, 513 U.S. at 122 (citing H.R. Rep. No. 100–963, at 10 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5782, 5791). Congress changed that in the VJRA, however, expanding the scope of judicial review concerning veterans' benefits in two key aspects. Veterans Judicial Review Act, § 301. First, for veterans challenging their benefit awards, the VJRA established three levels of appeal: (1) the Court of Veterans Appeals (an Article I court the VJRA created), which has "exclusive jurisdiction to review decisions of the Board of Veterans' Appeals," 38 U.S.C. § 7252(a); (2) our court, which has "exclusive jurisdiction to review and decide any challenge to the validity of any statute or regulation or any interpretation thereof" (such as the regulation at issue in this case, 38 C.F.R. § 3.156(c)(1)), 38 U.S.C. § 7292(c); and (3) the Supreme Court, 38 U.S.C. § 7292(c). Second, for veterans dissatisfied with VA regulations and rules concerning veterans' benefits, the VJRA allows for direct challenges to our court. *See* 38 U.S.C. § 502. Congress created this two-step opportunity for review "for the purpose of ensuring that veterans were treated fairly by the government and to see that all veterans entitled to benefits received them . . . ." *Barrett v. Nicholson*, 466 F.3d 1038, 1044 (Fed. Cir. 2006).

Congress also codified the VA Secretary's duty to assist. Veterans' Judicial Review Act, Pub. L. No. 100–687

§ 103, 102 Stat. 4106 (1988) (codified at 38 U.S.C. § 3007(a) (1988)) ("The Administrator shall assist such a claimant in developing the facts pertinent to the claim."). Prior to the VJRA's passage, Congress imposed no such statutory duty, and the Secretary's obligation to assist veterans make out their benefit claims only existed to the extent granted by regulation. *See, e.g.*, 38 C.F.R. §§ 3.102, 3.103 (1988). The codification of the Secretary's "duty to assist" removed the VA's ability to revise its regulations to strip veterans of this right or to receive *Auer* deference for any narrow interpretation of that right. These beneficent changes to provide greater remedial treatment to veterans in acknowledgement of their service to this country were just the beginning.

The VJRA is replete with provisions designed to make it easier for veterans to obtain benefits and to challenge denial of such benefits. The development of this veteran-friendly scheme and its remedial nature was the very raison d'être for passage of the VJRA. As we noted in *Hodge v. West*, "even in creating judicial review in the veterans context, Congress intended to preserve the historic, pro-claimant system." 155 F.3d 1356, 1363 (Fed. Cir. 1998). There, we cited the VJRA's legislative history discussing Congress's desire for the veterans' benefits system to remain "pro-claimant":

Each year, the Veterans' Administration (VA) processes approximately 5 million claims. In most cases, claimants submit their own applications without assistance. If a claimant desires advice or other help, VA provides specially-trained personnel to answer inquiries and assist in the submission of the claim. VA's medical facilities often serve as an important referral source, and the major veterans service organizations also furnish claims assistance by trained specialists at no charge.

> *Congress has designed and fully intends to maintain a beneficial non-adversarial system of veterans benefits.* This is particularly true of service-connected disability compensation where the element of cause and effect has been totally by-passed in favor of a simple temporal relationship between the incurrence of the disability and the period of active duty.

> *I[m]plicit in such a beneficial system has been an evolution of a completely ex-parte system of adjudication in which Congress expects VA to fully and sympathetically develop the veteran's claim to its optimum before deciding it on the merits. Even then, VA is expected to resolve all issues by giving the claimant the benefit of any reasonable doubt. In such a beneficial structure there is no room for such adversarial concepts as cross examination, best evidence rule, hearsay evidence exclusion, or strict adherence to burden of proof.*

H.R. Rep. No. 100–963, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5782, 5794–95 (emphasis added).

We need not guess the congressional intent behind the VJRA; Congress told us by legislating against the backdrop of the pro-veteran canon of construction, crafting a detailed remedial statutory scheme, and expressly affirming its beneficent purpose in the Act's legislative history. It wanted all aspects of the Act to be liberally construed in favor of the veterans.

Congress asked the VA to effectuate this intent by promulgating regulations designed to do so. The text of 38 U.S.C. § 501 provides the VA Secretary with the "authority to prescribe all . . . regulations with respect to the nature and extent of proof and evidence and the method of taking and furnishing them in order to establish the right to benefits under such laws. . . ." 38 U.S.C. § 501(a)(1). Under this rulemaking authority, the VA Secretary

promulgated 38 C.F.R. § 3.156, which generally allows a veteran to reopen a previously denied claim when "new and material evidence" surfaces. *See* 38 C.F.R. § 3.156(a). Section (c) of this regulation, at issue here, states an exception to this general rule by requiring the VA to reconsider a veteran's previously denied claim when "relevant official service department records that existed and had not been associated with the claims file when VA first decided the claim" come to light, regardless of whether they are "new and material." 38 C.F.R. § 3.156(c)(1) (noting that this section applies "notwithstanding paragraph (a)"). Thus, we are not only dealing with a remedial statute, we are dealing with a regulation designed to help right administrative wrongs. Our court has recognized that "courts are to construe remedial statutes liberally to effectuate their purposes." *Smith v. Brown*, 35 F.3d 1516, 1525–26 (Fed. Cir. 1994) (citing *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991) and *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196 (1980)), *superseded on other grounds by* 38 U.S.C. § 7111. That includes remedial regulations.[3]

The Supreme Court has commanded as much in multiple contexts. *See, e.g., Socony-Vacuum Oil Co. v. Smith,*

---

[3]   The Prost Concurrence argues that the very fact that Congress has worked hard over the years to protect veterans is reason *not* to consider the pro-veteran canon of construction when considering a less than clear term in a statute or regulation. Prost Concurrence at 14. That cannot be right. Congress cannot anticipate every linguistic debate over the terms of a statute, and certainly cannot anticipate debates regarding the meaning of not-yet drafted regulations. It is *because* Congress drafts veterans legislation against the backdrop of the pro-veteran canon that Congress does not need to be clairvoyant in order to see that its intent to benefit veterans can be effectuated when parties have legitimate debates regarding terms employed.

305 U.S. 424, 431 (1939) ("[R]emedial legislation for the benefit and protection of seamen has been liberally construed to attain that end."); *McDonald v. Thompson*, 305 U.S. 263, 266 (1938) ("[T]he [Motor Carrier] Act is remedial and to be construed liberally. . . ."); *see also United States v. Merriam*, 263 U.S. 179, 188 (1923) ("If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer.") (citing *Gould v. Gould*, 245 U.S. 151, 153 (1917)); *see also Bowers v. New York & Albany Lighterage Co.*, 273 U.S. 346, 350 (1927) ("The provision is a part of a taxing statute; and such laws are to be interpreted liberally in favor of the taxpayers."); *see also United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 839 (2001) (Thomas, J., concurring) ("At a bare minimum, in cases such as this one, in which the complex statutory and regulatory scheme lends itself to any number of interpretations, we should be inclined to rely on the traditional canon that construes revenue-raising laws against their drafter."); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163, 166 (2012) (interpreting regulations implementing the Fair Labor Standards Act ("FLSA") against the backdrop of the congressional intent behind FLSA—i.e., to protect low wage employees).

Veterans deserve no less protection than low wage employees or taxpayers. *See, e.g.*, *United States v. Oregon*, 366 U.S. 643, 647 (1961) ("The solicitude of Congress for veterans is of long standing."); *Henderson*, 562 U.S. at 440 (noting that Congress's longstanding solicitude for veterans "is plainly reflected in the VJRA, as well as in subsequent laws that 'place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions.'") (quoting *United States v. Oregon*, 366 U.S. at 647); *Shinseki v. Sanders*, 556 U.S. 396, 412 (2009) ("[W]e recognize that Congress has expressed special solicitude for the veterans' cause. . . . A veteran, after all, has performed an especially important service for the Nation, often at the risk of his or her own life. And Congress has

made clear that the VA is not an ordinary agency. Rather, the VA has a statutory duty to help the veteran develop his or her benefits claim.") (quoting Veterans Claims Assistance Act of 2000, 38 U.S.C. § 5103A). Despite all of this, and the apparent recognition that deferring consideration of the pro-veteran canon until after an ambiguity is found would be inconsistent with the Supreme Court's directive in *Kisor II* to consider all canons of construction *before* finding an ambiguity, the panel majority charts a new course, with a familiar end.

## II.

The majority has again modified its reasoning concerning the application of the pro-veteran "interpretive principle[]." *King*, 502 U.S. at 221 n.9; *see Kisor IV* Majority Modified Op. As noted, the *Kisor IV* majority now reasons that the pro-veteran canon does not apply unless there is "interpretive doubt" after the "use of ordinary textual analysis tools," which do not include the pro-veteran canon of construction. *Id.* at 16. I believe the majority's conclusion in *Kisor IV* is just as problematic as its challenged conclusion in *Kisor III*, if not more so.

As a threshold matter, I believe the majority's shift from relying on "ambiguity" in *Kisor III* to "interpretive doubt" in *Kisor IV* to avoid applying the pro-veteran canon is a distinction without a difference. There is no discernible daylight between these terms. *See, e.g.*, *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1378 (Fed. Cir. 2001) ("[W]hen a statute is ambiguous, interpretive doubt is to be resolved in the veteran's favor." (internal quotation omitted)); *compare Doubt, v.*, OED ONLINE, https://www.oed.com/view/Entry/57078 (last visited Apr. 14, 2021) (defining "doubt" as "[t]o be in doubt or uncertainty; to be wavering or undecided in opinion or belief") *with Ambiguity, n.*, OED ONLINE, https://www.oed.com/view/Entry/6144 (last visited Apr. 14, 2021) (defining "ambiguity" as "originally and chiefly with

reference to language: the fact or quality of having different possible meanings; capacity for being interpreted in more than one way; (also) lack of specificity or exactness"). The entire point of statutory construction is to interpret text and give effect to congressional intent.

The majority cites nothing in support of its contention that "ordinary textual analysis tools" include *only* those narrowly subscribed by the majority. It cites only *Brown v. Gardner* for its decision to remove the pro-veteran canon—and apparently numerous other canons—from the interpretive toolkit it employs. But *Brown* does not hold that the pro-veteran canon is only an after the fact inquiry, or, as the Prost Concurrence asserts, must be relegated, like the rule of lenity, to "the end of the analysis."[4] Prost Concurrence at 12. Indeed, quite the contrary. The language in *Brown* from which the *Kisor IV* majority's "interpretive doubt" language is plucked only refers to what the government "at most could claim" and appears just before

---

[4]    Despite the Supreme Court's opinion in this very case implying the opposite, the Concurrence by Judge Hughes ("Hughes Concurrence") asserts that *Chevron* and *Auer* deference must still trump the pro-veteran canon. The Prost Concurrence holds open the same possibility. That is flatly inconsistent not only with *Kisor II*, but with the Supreme Court's directive that *Chevron* and *Auer* do not even enter the picture until it is clear that the canons do not supply the answer. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (quoting *NLRB v. Alt. Ent., Inc.*, 858 F.3d 393, 417 (6th Cir. 2017), *abrogated by Epic Sys. Corp.*, 138 S. Ct. 1612). Quite simply, the "canons trump deference." Kenneth A. Bamberger, *Normative Canons in the Review of Administrative Policymaking*, 118 Yale L.J. 64, 77 (2008). Given the agency context in which the canon arises, relegating its consideration until after *Chevron* and *Auer* deference would render it a nullity.

the Court concludes that "the Government cannot plausi-
bly make *even* this claim here." *Brown*, 513 U.S., 117–118
(emphasis added).  In full, it reads,

> The most, then, that the government could claim
> on the basis of this term is the existence of an am-
> biguity to be resolved in favor of a fault require-
> ment (assuming that such a resolution would be
> possible *after* applying the rule that interpretive
> doubt is to be resolved in the veteran's favor . . . .).

*Id.* (emphasis added).  Nowhere does the Court hold what
the panel claims it holds.  It does *not* say that the parts of
a "usual textual analysis"—other than the plain language
of the words used—do anything other than help resolve "in-
terpretive doubt."  And, it does not say that the pro-veteran
canon is anything other than an interpretive canon.  All
*Brown* did was emphasize that the pro-veteran canon of
construction is an *additional* tool in the "usual" tool kit
when the statute or regulation being interpreted is embed-
ded in a remedial statute whose congressional purpose is
to benefit veterans.[5]

---

[5]    The Prost Concurrence misreads *Brown*.  It under-
stands *Brown* to create a new *necessary* condition for ap-
plying the pro-veteran canon: interpretive doubt.  That is,
the pro-veteran "canon applies ***only when*** there is 'inter-
pretive doubt.'"  Prost Concurrence at 6 (emphasis added)
(quoting *Brown*, 513 U.S. at 118).  But *Brown* does not nar-
row the Supreme Court's liberal interpretation rule.  The
Supreme Court made clear "interpretative doubt is to be
resolved in the veteran's favor."  *Brown*, 513 U.S. at 117–
118.  Put simply, if there is interpretive doubt, then the
veteran gets the benefit of that doubt.  That is a *sufficient*
condition for applying the pro-veteran canon.  By mixing
necessary and sufficient conditions, the Prost Concurrence

Importantly, moreover, *Brown* did not overrule *Boone* and its progeny and create a new, more stingy, "*Brown* formulation" of the pro-veteran canon. Prost Concurrence at 12. Indeed, in *Brown*, the Court cited to *King*, *see Brown*, 513 U.S. at 118 (citing *King*, 502 U.S. at 220–221, n.9), which in turn cited to *Fishgold*, *see King*, 502 U.S. at 220–221, n.9 (quoting *Fishgold*, 328 U.S. at 285), which, in turn, relied upon *Boone*, *see Fishgold*, 328 U.S. at 285 (quoting *Boone*, 319 U.S. at 575). And, in *Henderson*, which post-dated *Brown*, the Supreme Court again cited to *King*. *See Henderson*, 562 U.S. at 441 (quoting *King*, 502 U.S. at 220–221, n.9). If *Brown* changed the law, one would think the Supreme Court would acknowledge that fact rather than continue to rely on the line of cases relying on *Boone*.

The panel majority's latest approach is inconsistent with multiple Supreme Court cases which discuss the pro-veteran canon and treat it as one of the many canons of construction to be *collectively* employed when interpreting veterans benefit provisions. *See, e.g.*, *Henderson*, 562 U.S. 428; *King*, 502 U.S. 215. It is particularly important to include the pro-veteran canon in the interpretive mix when, not only is the entire statutory scheme at issue a beneficent one, but the *particular provision* at issue is intended to remedy administrative wrongs against veterans, as

---

commits a classic fallacy. *See, e.g.*, *Wilson v. Horton's Towing*, 906 F.3d 773, 782 (9th Cir. 2018) ("Plaintiff's argument commits the logical fallacy of mistaking a sufficient factor for a necessary one."); *Arar v. Ashcroft*, 585 F.3d 559, 601 (2d Cir. 2009) ("This appears to reflect a classic logical fallacy, 'denial of the antecedent,' which mistakes a necessary condition for a sufficient one."); *cf. N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1580 (Fed. Cir. 1994) ("To suppose that a state must have a pecuniary interest in a matter . . . is to mistake a necessary for a sufficient condition for the assertion of personal jurisdiction.").

§ 3.156(c)(1) does by relieving veterans of the finality of an adverse decision when records in the VA's possession relating to that decision are located and could upend the denial of benefits.

Once having started down the road of its interpretive exercise, the majority in *Kisor IV* was bound to include the pro-veteran canon of construction in its analysis and give effect to it along with other applicable canons of construction. *See, e.g., Kisor II* at 2415 (saying all canons get construed at step one). The question here is not so much whether the word "relevant" (as used in 38 C.F.R. § 3.156(c)) could possibly have a restrictive meaning (as the *Kisor IV* majority appears to believe). Rather, when reviewing an agency's interpretation of a statute or regulation (as is the case here), the Supreme Court has made clear that we are to apply all tools of statutory construction to glean congressional intent. Where differing plausible, reasonable interpretations of the terms of a regulation are possible, Congress has spoken: it wants veterans' benefits to be administered in a "pro-claimant" manner. Congress's explicit pro-veteran desire in the VJRA, as well as the remedial nature of 38 C.F.R. § 3.156(c), lead me to conclude that the pro-veteran canon should be used alongside traditional tools of statutory construction in this case.[6] *Kisor IV*'s failure to

---

[6] This does not mean that the veteran will always win when the canon is considered. It may well be that other more appropriate interpretive tools compel a different resolution of the question presented. *See Lockhart v. United States*, 136 S. Ct. 958, 963 (2016) (applying the rule of the last antecedent as a statutory canon of construction to avoid finding a criminal statutory term ambiguous, but noting that "[o]f course, as with any canon of statutory interpretation, the rule of the last antecedent 'is not an

18                                                     KISOR v. MCDONOUGH

recognize as much flies in the face of clearly expressed congressional intent.

To be sure, there are certain rules courts may apply when all efforts to figure out the meaning of a statute or regulation leave courts to "guess as to what Congress intended." *Abramski v. United States*, 573 U.S. 169, 188 n.10 (2014) (discussing rule of lenity) (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013)). These are judge-made tie breakers implementing *judicial* policy choices, however. *Auer* is one such tie breaker, as is the canon of constitutional avoidance. These do not represent rules implementing congressional intent, however, they are rules courts fall back on when congressional intent cannot be ferreted out. The Prost Concurrence is wrong to equate the two.[7] Here, as mentioned before, we know Congress's

---

absolute and can assuredly be overcome by other indicia of meaning'") (citations omitted). In this case, there is no such interpretive tool compelling the result the panel majority reaches.

[7] The Prost Concurrence is also wrong when it discusses the difference between "descriptive" and "normative" canons, characterizes the latter as less important, and then places the pro-veteran canon in the normative bucket, citing *Arangure v. Whitaker*, 911 F.3d 333, 346 (6th Cir. 2018). Putting aside the fact that *Arangure* never mentions the pro-veteran canon, it also never explains whose "norms" it was discussing—Congress's policy choices or the courts' policy choices. And, *Arangure* expressly concludes that the Supreme Court has never created a hierarchy ranking the importance of canons of construction, has applied even what some classify as classic policy-based canons at step one of the *Chevron* analysis, has adopted a "canons first" approach to *Chevron*, and that "most canons" are "traditional tools of statutory construction" that apply

intent from multiple indicators—including the text of the VJRA itself—and that intent provides the backdrop against which the interpretive inquiry in veterans' benefit cases is to occur. *See, e.g.*, *Fishgold*, 328 U.S. at 285 ("Our problem is to construe the separate provisions of the [Selective Service] Act as parts of an organic whole and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits."); *see also King*, 502 U.S. at 221 n.9 ("Even if the express examples [in other portions of the Act] unsettled the significance of subsection (d)'s drafting, however, we would ultimately read the provision in King's favor under the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.") (citing *Fishgold*, 328 U.S. at 285).

This is why the majority's *cf.* cite to *Connecticut National Bank v. Germain*, 503 U.S. 249, 253–54 (1992) is particularly unhelpful to its cause. *See Kisor IV* Majority Modified Op. at 16. That case stands for the proposition that, where a statute is clear on its face, the court is to assume that Congress intended what it clearly said. In other words, courts must assume that Congress expressed its intention and that no other "tools" are needed to assess congressional intent. True. Here, however, the majority does not pretend to end its analysis with the language of § 3.156(c). It purports to use some, but not all, canons of construction to imbue a single word in the regulation with a thirty-nine word definition.[8] That case is also unhelpful

---

at step one. As the Supreme Court did in *King*, the pro-veteran canon is to be considered on the way to determining whether a genuine ambiguity within the meaning of *Chevron* exists. Characterizing the canon as "normative" does not change that fact.

[8] As noted later, the panel majority does not even stay true to the canons on which it purports to rely.

to the panel majority's cause because it was not decided in the context of a remedial scheme designed to benefit the class of claimants of which the appellant was a part.

A return to the Supreme Court's decision in *Christopher* is instructive. *Christopher* involved the FLSA, whose legislative history indicated that Congress passed it with the goal, *inter alia*, of "protect[ing] all covered workers from substandard wages and oppressive working hours." *Christopher*, 567 U.S. at 147 (citation omitted). Petitioners argued that their employers violated FLSA by failing to compensate them for overtime. The Department of Labor submitted an amicus brief to the Court arguing that the Department interpreted its own regulations to exclude Petitioners from FLSA's overtime protections and asked the Court to defer to that conclusion under *Auer*. Relevant here, the Justices reasoned that to give deference to the Department would do damage to the remedial intent behind FLSA. It considered all tools of statutory interpretation with that remedial backdrop in mind. Thus, it did not relegate the remedial purpose of the scheme to an afterthought.[9]

---

[9]     The Prost Concurrence claims *Christopher* held that the remedial purpose canon was "inapposite because the Court was interpreting a general definition that applies throughout the FLSA." Prost Concurrence at 11 (internal quotations omitted). But the Prost Concurrence conflates two interpretive canons. In a footnote, the Court discusses a rule of narrow construction: "exemptions to the FLSA must be 'narrowly construed against the employers seeking to assert them. . . .'" 567 U.S. at 164 n.21 (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)). Relegation of that narrow construction rule does not undermine the Court's lengthy discussion of and reliance on the statute's remedial purpose. *Id.* at 166–67. Most critically,

I do not agree with the Prost Concurrence that the pro-veteran canon is a canon of last resort in the interpretive process, to be relegated to the end of the analysis. Nor do I believe Congress legislated with that mindset. After a tortured walk through the history of the pro-veterans canon, the Prost Concurrence concludes that whatever its form (a liberal construction principle or a narrower tie-goes-to-the-runner principle), it comes only at the end, if at all. The Prost Concurrence is clear that the pro-veteran canon applies *only after* other canons "yield[] competing plausible interpretations, none of which is fairly described as the best." Prost Concurrence at 2. What the Prost Concurrence never tells us is—by what measure do we decide if one plausible interpretation is "the best." Canons of construction "are an unruly team," often "pulling in opposite directions." *Sullivan v. Freeman*, 944 F.2d 334, 337 (7th Cir. 1991). Such is not unusual. But when the text yields competing plausible interpretations, all of the canons ought to be consulted and weighed in the analysis.

Given the importance of the issue—the scope and applicability of a canon of construction—and the enormous impact of today's determination that the pro-veteran canon is all but inapplicable to future cases, I dissent from the court's refusal to take the issue en banc.

## III.

Putting aside the pro-veteran canon and the role it should play in the inquiry before us, the actual interpretive exercise in which the panel now engages is flawed on multiple other levels. As the panel recognized in *Kisor I*, the plain language of 38 U.S.C. § 501 provides no clear indication that Congress intended for a "relevant" record as described in 38 C.F.R. § 3.156(c)(1) to "address a dispositive

---

*Christopher* applied the remedial construction canon at *Chevron* step one.

issue and therefore . . . affect the outcome of the proceeding" as the VA Secretary and the *Kisor IV* majority now contend. *Kisor IV* Majority Modified Op. at 9. Nor does the legislative history behind 38 U.S.C. § 501(a) (or its statutory precursor, 38 U.S.C. § 210(c)), provide such an indication. *See* Pub. L. No. 85–857, § 210(c) 72 Stat. 1105, 1114 (1958); *see also* Pub. L. No. 102–83, § 501(a) 105 Stat. 378, 386 (1991). The majority also fails to apply the canon of imputed common law meaning, which states that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Neder v. U.S.*, 527 U.S. 1, 21 (1999) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)). As Judge Reyna points out in his panel dissent, the majority's strained definition of relevant in § 3.156(c)(1) is inconsistent with the way we have defined relevance in multiple other veteran-related contexts. As he explains, it is inconsistent with how we have interpreted relevance in the context of 38 U.S.C. § 5103(A). *See, e.g.*, *Jones v. Wilkie*, 918 F.3d 922, 926 (Fed. Cir. 2019) (holding records need not "prove" claim to be relevant); *McGee v. Peake*, 511 F.3d 1352, 1357 (Fed. Cir. 2008) (holding records need not be dispositive of claim to be relevant); *Golz v. Shinseki*, 590 F.3d 1317, 1321 (Fed. Cir. 2010) (holding records need only relate to a claim and have a reasonable possibility of substantiating it). And, it is inconsistent with what we have said qualifies as "material" evidence, a directly comparable concept. *See Kisor IV* Dissent Modified Op. at 11–13. I commend the reader to those thoughtful discussions.

Beyond these inconsistencies, the definition the *Kisor IV* majority now crafts is also inconsistent with both common and legal usages of the term "relevant." Rather than needing to be "relevant to an issue that was dispositive" as the *Kisor IV* majority asserts, *see Kisor IV* Majority Modified Op. at 9, the plain meaning of "relevant" simply

indicates that something is "[b]earing on or connected with the matter in hand; closely relating to the subject or point at issue; pertinent to a specified thing," *Relevant, adj.*, OED ONLINE, https://www.oed.com/view/Entry/161893?redirectedFrom=relevant#eid (last visited Apr. 14, 2021). The Federal Rules of Evidence similarly provide an expansive definition of legal relevance. *See* Fed. R. Evid. 401 (defining evidence as relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action"). And, other circuits have recognized as much. *See, e.g., United States v. Guerrero-Cortez*, 110 F.3d 647, 652 (8th Cir. 1997) (noting that "[t]he threshold of relevance [] is quite minimal"); *United States v. Hamzeh*, 986 F.3d 1048, 1052 (7th Cir. 2021) ("Whether evidence is relevant is a low threshold."); *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 76 (1st Cir. 2010) (reasoning that "[a] relevancy-based argument is usually a tough sell" given how broadly the Federal Rules of Evidence define relevance).

In all of these ways, the *Kisor IV* majority ignores normal textual, contextual, and linguistic cues that point to an appropriate interpretive conclusion: Mr. Kisor is right that his detailed combat records are relevant to his service-related claim for benefits. The *Kisor IV* majority's definition of "relevant" is a strained, Federal Circuit-specific definition that is not only out of step with common and legal usages of the term, but ignores the remedial context in which it appears.

It is an interpretation, moreover, that none of the concurring opinions even pretend to defend. The Prost and Hughes Concurrences are silent on the issue.[10] And the Concurrence by Judge Dyk ("Dyk Concurrence") takes

---

[10]    In this way, the Prost Concurrence is simply an interesting discussion of principles of construction untethered from the facts of this case.

direct issue with the majority's interpretation, seeming to agree with the dissent's broader interpretation:

> As the panel majority appears to admit, "[r]elevant records for the purpose of § 5103A are those records that relate to the injury for which the claimant is seeking benefits and have *a reasonable possibility of helping to substantiate the veteran's claim.*" *Golz v. Shinseki*, 590 F.3d 1317, 1321 (Fed. Cir. 2010) (emphasis added)

Dyk Concurrence at 2–3 (citing *Kisor IV* Majority Modified Op. at 13) (emphasis in original). While the Dyk Concurrence says the panel got it wrong, it also says it is not an important enough error to fix via the en banc process. *Id.* at 4. But, not fixing the error leaves intact a precedential interpretation of an important and oft-resorted to remedial regulation. It leaves intact a precedential decision effectively nullifying the pro-veteran canon of construction. And, it means that not only does the veteran lose here, he loses for reasons that the Dyk Concurrence concedes are wrong. We should not let any of that happen.

## IV.

I must dissent from the denial of en banc once more in this matter. This is not a case of the panel majority repeatedly trying to get it right and finally doing so. It is not wisdom coming belatedly, but coming nonetheless. It is a circumstance where the panel majority ignores the remedial context in which it is operating and employs a strained, incorrect interpretive analysis to justify its ruling against this veteran. Because we have refused to hear this case en banc and make clear that the pro-veteran canon trumps *Chevron* and *Auer*, I hope the Supreme Court will be willing to grant certiorari once more, and that the veteran will finally win.

# United States Court of Appeals
# for the Federal Circuit

---

**JAMES L. KISOR,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2016-1929

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 14-2811, Senior Judge Alan G. Lance, Sr.

---

REYNA, *Circuit Judge*, with whom NEWMAN, MOORE, and O'MALLEY, *Circuit Judges*, join, dissenting from the denial of rehearing en banc.

I dissent from the court's denial of appellant's petition for en banc review. As basis, I rely on my dissent to the underlying majority opinion, which I adopt and incorporate in this dissent. I make the following comments to cast further light on the importance of the pro-veteran canon of interpretation.

The majority opinion has created a new rule of law and uses it to reach a decision that will adversely impact thousands of veterans' claims for service-connected disability

benefits.  The majority holds that the pro-veteran canon only applies where "interpretive doubt" remains after all other tools of statutory construction fail to resolve ambiguities.  This means that the pro-veteran canon comes into play at the bottom of the ninth inning, after three outs have been made, and as the players head to their respective dugouts.  But by then, it's game over.

The veterans disability statutes are remedial, and disability benefits provisions are benevolent in nature.  Dissent Modified Op. at 3.  Congress plainly intended that when an *ambiguity* arises in the interpretation of a provision pertaining to the award of disability benefits, resolution should tilt in favor of the veteran.[1]  There is no distinction between ambiguity and interpretive doubt.

In sum, this case precisely illustrates the error inherent in this court's new "interpretive doubt" rule.  First, the majority determined that there exists ambiguity in the meaning of the "relevant records" provision.  Next, it considered arguments favorable to the VA's interpretation of "relevant records."  Then, it applied some canons of statutory construction to reach a decision that was not favorable to veterans.  Last, it determined that since it arrived at a construction, it no longer had "interpretive doubt," so the pro-veteran canon did not apply.  Dissent Modified Op. at 21 (citing Majority Modified Op. at 16).  Here, the majority utilized every single canon in its armory to find the provision unambiguous and avoid resorting to the pro-veteran

---

[1]    *See Henderson v. Shinseki*, 562 U.S. 428, 439 (2011) ("The solicitude of Congress for veterans is of long standing.  And that solicitude is plainly reflected in the VJRA, as well as in subsequent laws that place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions.") (internal quotation marks and citations omitted).

canon.  As a result, the pro-veteran canon was left out of the traditional interpretive toolkit altogether.

For these reasons, and those stated in my dissent to the majority opinion, I dissent to the denial of appellant's petition for en banc review.